RONALD LUPO, Plaintiff-Appellant, *v.* BOARD OF FIRE AND POLICE COMMISSIONERS OF THE VILLAGE OF GLENDALE HEIGHTS, Defendants-Appellees.

Second District    No. 79-67

Opinion filed November 1, 1979.—Supplemental opinion filed on rehearing April 21, 1980.

Richard N. Williams, of Schaumburg, for appellant.

Rick F. Orsinger, of Wheaton, for appellees.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

Ronald Lupo, a lieutenant in the Glendale Heights Police Department, was charged with violating department regulations against disseminating confidential information and against participating in the investigation of the same matter. Following a hearing before the Municipal Board of Fire and Police Commissioners he was found guilty of the charges and was suspended for a period of 10 days without pay on each charge, to be served consecutively. His subsequent complaint for administrative review was dismissed by the circuit court, which affirmed the findings of suspension. He appeals, contending that the hearing before the board failed to provide constitutional safeguards and that its findings were against the manifest weight of the evidence. We do not agree.

The department's regulation relating to giving out confidential information (Rule 30(A)) provided, in substance, that members of the department were not to reveal to outsiders police information ordinarily accessible only to members of the department. Evidence was presented that Lieutenant Lupo believed that former Chief Saccamonto had committed various irregularities and Lupo brought these to the attention of the village manager approximately a year earlier but apparently nothing was done about them. Subsequently Saccamonto resigned, but there were rumors that he was returning in some capacity. Lieutenant Lupo met with two newspaper reporters who had been engaged in an ongoing investigation of Saccamonto. Later newspaper reports contained information which the village board concluded could only have come from the confidential personnel files of the department.

Lupo gave his statement to the new police chief in connection with an investigation into the "leaks." He said the reporter asked him "If it was possible that he, Saccamonto, did not graduate from high school," and also asked him if he knew anything about "an altered military discharge paper." Lupo stated:

"I stated I was aware of a copy of a diploma from Washburn Trade School in Chicago dated January—question on the date—

1955, and that I thought it may be forged due to the bad copy and poor typing."

"I was aware that in his personnel file there was a DD214 discharge paper from the Army that in my opinion had been altered where it called for years of high school finished."

Plaintiff principally argues that the information was no longer confidential because it was already known to the reporters; that, under the circumstances, the application of the confidentiality rule was an unconstitutional interference with his right of free speech, and that the dissemination of the information was not, in fact, shown to be detrimental to the efficiency of the department.

We cannot agree, first, that the particularized information which Lieutenant Lupo furnished from the personnel files of the Department was merely a verification of what the reporters already knew. While they may have had some suspicions, he actually furnished specific details which the reporters were not shown to have known and which would have had to come from his examination of the confidential personnel files. In addition, he furnished his opinion, based on his inspection of the files, that there were alterations in the documents from which he concluded that they were forged or altered.

■■ Nor can we agree that the application of the confidentiality rule under the circumstances violated the officer's constitutional rights. It is true, as he argues, that authorities hold that a public employee may not be deprived of the right to comment on matters of public importance when the subject matter of the public comment is only insubstantially connected with his employment. (*Pickering v. Board of Education* (1968), 391 U.S. 563, 574, 20 L. Ed. 2d 811, 820-21, 88 S. Ct. 1731, 1738.) Thus, in *Pickering,* the United States Supreme Court held that teachers could not be discharged for attacking the school board's handling of a bond issue and the allocation of funds between the schools' educational and athletic programs since these were matters of general public interest and were neither shown nor presumed to have in any way impeded the teachers' proper performance of their duties or to have interfered with the regular operation of the schools generally. 391 U.S. 563, 572-73, 20 L. Ed. 2d 811, 819-20, 88 S. Ct. 1731, 1737.

*Pickering* requires that the right of a public employee to speak out on matters of public concern must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (391 U.S. 563, 568, 20 L. Ed. 2d 811, 817, 88 S. Ct. 1731, 1735.) The parties cite a number of Federal court cases in which the balancing test of *Pickering* has been applied. In *Hanneman v. Breier* (7th Cir. 1976), 528 F.2d 750, cited by the plaintiff, certain

Milwaukee police officers were held to have been improperly disciplined for violating the police department confidentiality rule by circulating a letter they had previously written to city officials. The letter informed them of an internal investigation of the department regarding forbidden political activity by the police employee association, which the department regarded as confidential. However, in *Hanneman* the existence of the internal investigation had already been reported in the press, and the court pointed out that the original leak to the press was never attributed to the officers or their organization. The court further noted that the ability of the police chief to conduct an internal investigation had already been destroyed by the article disclosing the existence of the investigation and the persons and subjects involved. The court also noted that the letter disclosed no factual information not contained in the newspaper article published the day before. 528 F.2d 750, 754.

Neither *Pickering* nor *Hanneman* matches the circumstances of this case. In *Pickering* the comments are related to matters which would be of concern to any member of the general public and upon which they might express the same opinion as the teachers with no disclosure made possible because of the teachers' employment and access to confidential records. Their speech was therefore not substantially connected with their employment. *Hanneman* also did not involve the disclosure of confidential information. Both cases recognize that there may be circumstances in which a public employer has a legitimate interest in preserving confidentiality in the conduct of its internal affairs. See *Hanneman*, at 754. See also *Pickering*, 391 U.S. 563, 570 n.3, 20 L. Ed. 2d 811, 818 n.3, 88 S. Ct. 1731, 1735 n.3.

In this case, the information which was disseminated had not previously been disclosed. Moreover, while the general inquiry related to a matter of general public concern, it also involved access to confidential personnel files not open to the general public which were maintained particularly as part of an internal operation of the police department. It may be presumed that there is some expectation of privacy by police employees who are required to give information of a very personal and intrusive nature in the particular employment process. This expectation of privacy is of a nature that both the employer and the department have an interest in maintaining personnel files as confidential, subject, of course, to proper investigation either internally or in disciplinary or criminal proceedings. There is the further fact that Lieutenant Lupo's access to the files was based on his position and working relationship with the department and therefore his unauthorized disclosures were directly and substantially related to his position with the department. See also *Fisher v.*

*Walker* (10th Cir. 1972), 464 F.2d 1147, 1153; *Magri v. Giarrusso* (E.D. La. 1974), 379 F. Supp. 353, 358-59.

■■ Nor do we agree with plaintiff's further argument that Lt. Lupo's statement could not be used in evidence because he was not told prior to making it that it could be used against him in a disciplinary proceedings. He agrees that the United States Supreme Court has held that an officer may not refuse on the grounds of self-incrimination to answer questions specifically, directly and narrowly related to the performance of his official duties when he is not required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution. (*Gardner v. Broderick* (1968), 392 U.S. 273, 278, 20 L. Ed. 2d 1082, 1086-87, 88 S. Ct. 1913, 1916; *Garrity v. New Jersey* (1967), 385 U.S. 493, 499, 17 L. Ed. 2d 562, 566-67, 87 S. Ct. 616, 618.) From this he reasons that it is coercive for a public employee to be asked questions which may result in loss of his property rights by suspension when presumably his right to plead self-incrimination is not made known to him. We fail to see the application here. Lieutenant Lupo was not asked nor offered any immunity or waiver of immunity in exchange for his testimony, was never threatened with a discharge or any penalty prior to answering his superior's questions during the department's internal investigation nor did he raise any objection to any phase of the questioning. Further, no statement made by Lieutenant Lupo forms the basis of any criminal prosecution, nor was there a threat that he could lose his position with the department if he refused to answer questions. The Illinois Supreme Court has appropriately noted:

> "No case has been cited, and we have found none, which holds that a public employer, in the course of a disciplinary hearing into an employee's conduct, may not require the employee to disclose information reasonably related to his fitness for continued employment." *Kammerer v. Board of Fire & Police Commissioners* (1970), 44 Ill. 2d 500, 506.

We have examined the other procedural objections offered by the plaintiff and find them insubstantial. We conclude that on the whole record plaintiff received a fair and impartial hearing.

The second charge involves the alleged violation of General Order 75—21 of the department which states:

> "III. B. In no event shall any of the officers involved in a police complaint be assigned to investigate a complaint involving them."

■■ Plaintiff does not deny, and the record shows, that he participated in the investigation of the alleged "leaks" and without advising anyone that he was personally involved. He claims, however, that the general order was inoperative because the mayor ordered an investigation in which he

directed all officers to give statements as "suspects." We fail to see how the mayor's direction affords Lieutenant Lupo a defense to the charge. Even though all of the members of the department were to be considered as "suspects" under the mayor's direction any officer knowing of his own involvement could not accept the assignment without violating the order.

Plaintiff also argues that plaintiff's actions were not shown to be detrimental to the discipline and efficiency of the police department and reasons that "therefore there was no cause for suspension." He relies principally on the statement in this court's opinion in *Humbles v. Board of Fire & Police Commissioners* (1977), 53 Ill. App. 3d 731, 735, "that the disciplinary action in some manner must promote the discipline and efficiency of the service." It is true that the present police chief, Lieutenant Mayerhofer, was asked whether the actions of Lupo detrimentally affected the efficiency of the operation and that he answered that he did not feel that it was detrimental "at the time." The fairly ambiguous statement, which was not further explored, was also inconsistent with other parts of his testimony. The question of detriment thus remained one of fact to be decided by the board. As we have previously noted the disseminating of confidential information from a personnel file must by its very nature detrimentally affect the efficiency of a department both with reference to its present personnel who have a reasonable expectation of privacy of their answers and its effect on any future applicants. We need not answer the question whether the conduct was serious enough to be a basis for a discharge since we have previously noted in *Humbles* that "misconduct which sound public policy would not recognize as good cause for permanently terminating an officer may nonetheless provide good cause for a temporary suspension." 53 Ill. App. 3d 731, 735.

Finally, from our review of the entire record we conclude that the decision rendered by the board was not against the manifest weight of the evidence. The judgment of the circuit court affirming the Board of Fire and Police Commissioners is therefore affirmed.

Affirmed.

WOODWARD and NASH, JJ., concur.

## SUPPLEMENTAL OPINION ON REHEARING
Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

We granted a rehearing based on plaintiff's claim that he has been denied constitutional equal protection. He now argues that a requirement that an officer be given warnings prior to interrogation found in the civil

service provisions in division I of article 10 of the Municipal Code (Ill. Rev. Stat. 1977, ch. 24, par. 10—1—18) must be read in *pari materia* with the provision here applicable to a division II municipality. Ill. Rev. Stat. 1977, ch. 24, par. 10—2.1—17.

■■ Plaintiff relies on *Palcek v. City of Chicago Heights* (1979), Ill. Rev. Stat. 702, published subsequently to his oral argument. *Placek* noted that the legislature had specifically provided civil service employees, including police officers in division I municipalities, with the safeguards which included, among others, that before he may be interrogated he must be advised in writing that his admissions may be used as the basis for charges seeking his removal or discharge and that he has the right to counsel. (74 Ill. App. 3d 702, 704.) Further noting that there is no similar provision in the statute governing removal or discharge in division II municipalities, the court found no reasonable basis for a different legislative classification. It concluded that although concededly no due process issue was involved, the division I safeguards must be read into the provisions applicable to division II municipalities to avoid a denial of equal protection. (74 Ill. App. 3d 702, 706.)

*Palcek* was decided purportedly on the basis of *Kropel v. Conlisk* (1975), 60 Ill. 2d 17. However, we do not believe that *Kropel* mandates the result reached in *Palcek*.

The equal protection analysis employed in *Kropel* is very different from that to be followed in the situation faced in *Palcek* and the case at bar. In *Kropel*, an independent constitutional right, due process, of a particular class was violated. The equal protection language was essentially cumulative or an alternative ground for decision. *Kropel* does not stand for the proposition that everything in section 10—2.1—17 must be read into section 10—1—18 and 10—1—18.1, and vice versa.

Here, neither a fundamental right nor a suspect classification is involved. Classifications related to population are not inherently suspect. (*People v. Palkes* (1972), 52 Ill. 2d 472, 77; *People v. Clark* (1979), 71 Ill. App. 3d 381, 393-94.) Thus the classification under attack must be upheld if there is a rational relationship between the statutory classification and the purposes of the legislation. The purpose need not be implicit in the legislation or found to have been in the mind of the legislators, for "any hypothetical purpose will support the classification." *People ex rel. Difanis v. Barr* (1979), 78 Ill. App. 3d 842, 848.

The purpose of the legislature in establishing different procedural protections for police officers in various classes of municipalities within a population range may have been to provide safeguards consistent with administrative resources and organizational ability. Municipalities do not fall within division I or division II solely on account of their population, since those with a population between 5,000 and 250,000 may choose

which division they will come under. Cities can thus make an informed decision as to which procedures and administrative structures are best suited to their needs, abilities, and resources. In comparing division I and division II, there is then a plausible connection between the procedural protections provided and the ability of the various municipalities to provide them. Smaller municipalities with fewer resources and less administrative apparatus are more likely to adopt division II procedures, as did Glendale Heights in the instant case. Thus the legislature made a rational choice in giving more procedural protection to officers of municipalities which are better equipped to handle investigations.

Even if the failure of the legislature to give written notice and warning to officers in division II municipalities was not by design, equal protection is not automatically violated. "[A] legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked." *McDonald v. Board of Election Commissioners* (1969), 394 U.S. 802, 809, 22 L. Ed. 2d 739, 746, 89 S. Ct. 1404, 1409.

The warning provision applicable to division I municipalities is part of a scheme which gives officers under civil service certain rights in the disciplinary proceedings. The legislature is free to make reforms one step at a time. (*Friedman & Rochester, Ltd. v. Walsh* (1977), 67 Ill. 2d 413, 421-22.) We cannot find that the classification made is wholly without any rational basis; therefore, we do not choose to follow the holding in *Palcek*. The judgment is therefore affirmed.

Affirmed.

WOODWARD and NASH, JJ., concur.