ROBERT McGOWEN, Plaintiff-Appellee, *v.* THE CITY OF BLOOMINGTON *et al.*, Defendants-Appellants.—(BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF BLOOMINGTON *et al.*, Defendants.)

Fourth District    Nos. 16973, 16983 cons.

Opinion filed September 9, 1981.

Frank Miles, of Hayes, Schneider, Hammer & Miles, Ltd., and David L. Stanczak, Corporation Counsel, both of Bloomington, for appellants.

Jennings and Thompson, of Bloomington (Michael J. Costello, of Costello, Young & Metnick, of counsel), for appellee.

Mr. JUSTICE WEBBER delivered the opinion of the court:

Defendants appeal from an order of the circuit court of McLean County sitting in administrative review (Ill. Rev. Stat. 1979, ch. 110, par. 264 *et seq.*) which reversed an order of the Board of Fire and Police Commissioners of the City of Bloomington (Board). The Board's order discharged plaintiff from his position as a police officer for the city.

The principal issue on appeal concerns the use of polygraph examinations and the results thereof in administrative hearings.

The facts giving rise to the litigation are these. Shortly before 6 a.m. on May 5, 1979, a burglary was discovered at a restaurant at the Bloomington-Normal airport. Evidence before the Board established that plaintiff had been in the area about 5 a.m. on the same date on routine patrol. Two other officers, Rouse and Aikin, arrived at about 5:15 a.m., also on routine inspection, and observed plaintiff's squad car parked near the scene of the break-in. One of them testified that at that time he saw nothing amiss with the door, which was later found to have been forced open by breaking the dead bolt on it. None of the three officers present in the area at the time observed one another. Rouse and Aikin returned to the stationhouse to run a license check on another automobile which they observed in the airport parking lot next to plaintiff's squad car.

All three officers, plaintiff, Rouse, and Aikin, were present in the stationhouse when the burglary was reported at about 6 a.m., and Rouse and Aikin were detailed to the scene. Plaintiff, who was not detailed, also went back to the airport and discussed the crime with the restaurant owner. He also examined the restaurant office where an unsuccessful attempt had been made to open a safe, took some measurements, and left before the end of his shift at 7 a.m. A detective, requested by Rouse and Aikin, arrived between 7:10 and 7:15 a.m.

Rouse and Aikin became suspicious of plaintiff and reported their suspicions to Harold Bosshardt, Bloomington police chief and defendant herein. After some investigation, the chief, who became concerned about rumors of a police officer being involved in the burglary, requested Rouse, Aikin, and plaintiff to submit to polygraph examinations. He testified before the Board that he hoped by means of the polygraph to disprove the rumors. These first examinations were conducted by Robert Abson, later deceased.

Nothing further appears in the record concerning the examinations of Rouse and Aikin and it may therefore be assumed that the chief was satisfied with those results. However, he ordered plaintiff to be re-examined by Abson and later by Harry Lockhard, another polygraph

operator of Champaign, Illinois. Subsequently, Bosshardt ordered plaintiff, Rouse, and Aikin to submit written reports to him concerning the incident and to answer specific questions posed by him.

Bosshardt informed plaintiff that he had become "disenchanted" with the results of plaintiff's polygraph examinations and requested plaintiff's resignation. Upon plaintiff's refusal, the chief then filed charges against him of neglect of duty and inefficiency, and alternatively, failure to report a burglary and making a false report concerning the burglary. The Board suspended plaintiff pending a hearing.

After a continuance, the Board held a hearing on November 16, 1979. Various witnesses, including Rouse, Aikin, Bosshardt and plaintiff, as well as persons connected with the restaurant and the airport, testified. The Board also heard evidence concerning the polygraph examinations. The parties stipulated as to the qualifications of the examiners and the proper conduct of the examinations. However, plaintiff's counsel objected to the results of the tests on the basis of reliability. Ruling on the objection was reserved.

Abson himself was dead at the time of the hearing, but his first report showed that he believed that plaintiff was not being truthful at his first examination. His report of the second examination indicated that he believed that plaintiff was deliberately distorting the polygraph and that it had been his experience that when one distorts in such a manner, he is doing so to avoid detection.

Lockhard testified that he had tested plaintiff, and, in his opinion, plaintiff was not being truthful.

On December 3, 1979, the Board issued its order disposing of pending motions, making findings of fact, and directing the dismissal of plaintiff. The order overruled plaintiff's objection to the polygraph results together with his motion to exclude them and stated *inter alia*:

> "* * * With the admission of the test results, the Board is satisfied that the charges are substantiated by a clear preponderance of the evidence. Without the admission of the test results, the Board is satisfied that the charges are not substantiated by a clear preponderance of the evidence. * * *"

Plaintiff timely moved the Board to reconsider and to reopen for additional evidence. The motion was allowed and at a supplemental hearing held February 25, 1980, evidence was received from three additional polygraph examiners, Jenkins, Floyd, and Bowers. While the record is less than absolutely clear on the point, there is a *prima facie* indication that each of these examinations was made at the request of the Board.

Jenkins and Bowers testified that their results showed that plaintiff was being truthful when he denied any involvement with the burglary. Floyd's report indicated that his examination was inconclusive.

Following the February 1980 hearing, the Board issued a supplemental order, affirming its earlier findings and order of dismissal and stated, *inter alia*:

"The Board continues to be confident of the pre-December 3, 1979 polygraph examinations and continues to place substantial weight on them * * *.

* * *

The opportunity for reflection since the December 3, 1979 hearing has made the Board even more confident about the accuracy of its determination and its factual basis in the record. * * *"

A court's scope of review of an administrative agency's decision is well known and requires no extended reiteration here. First, the court must determine whether the agency's findings of fact are contrary to the manifest weight of the evidence. (*Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (1981), 85 Ill. 2d 547, 426 N.E.2d 885.) However as the trial court pointed out in its memorandum opinion, the instant case requires more than that determination. We must first decide a question of law, namely, whether the findings of fact were based upon inadmissible evidence, and, if so, as to what extent that evidence influenced the decision of the administrative agency.

We then come to the heart of the matter: Are polygraph examinations and their results admissible as substantive proof in an administrative proceeding? We think not.

Two statutes in this State deal with polygraph tests. On the criminal side there is section 8b of division XIII of the Criminal Code of 1874 (Ill. Rev. Stat. 1979, ch. 38, par. 155—11). On the civil side there is section 54.1 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 54.1). These statutes are essentially parallel and in substance prohibit a court from requiring a criminal defendant, or a civil plaintiff or defendant, to submit to a polygraph test. Even the most superficial inspection of the statutes reveals that they in no wise deal with the admission of evidence. Furthermore, it has been repeatedly held that they do not apply to administrative proceedings. *Village of South Elgin v. Pollution Control Board* (1978), 64 Ill. App. 3d 565, 381 N.E.2d 778; *Chambliss v. Board of Fire & Police Commissioners* (1974), 20 Ill. App. 3d 24, 312 N.E.2d 842; *Austin v. Board of Fire & Police Commissioners* (1972), 7 Ill. App. 3d 537, 288 N.E.2d 113; *Coursey v. Board of Fire & Police Commissioners* (1967), 90 Ill. App. 2d 31, 234 N.E.2d 339.

*Village of South Elgin* stands for the broad proposition that the Civil Practice Act does not apply to administrative proceedings. The other cases dealt with polygraph examinations, but none of them presented the

precise question involved in the instant case. The closest one is *Chambliss* wherein polygraph results were admitted into the record in an administrative proceeding, but this was done without objection and counsel for the officer examined and cross-examined as to the results. "Consequently, * * * the results of the tests * * * could be *considered* by the Board in making its decision." (Emphasis added.) 20 Ill. App. 3d 24, 32, 312 N.E.2d 842, 847.

To "consider" the results is a far cry from the firm reliance placed on them as shown in the Board's order in the instant case. Furthermore, *Chambliss* was questioned in *Bart v. Department of Law Enforcement* (1977), 52 Ill. App. 3d 487, 367 N.E.2d 773, although the *Bart* court did not have occasion to pass upon the question, and it was the officer who was urging the admission of the polygraph. In *Coursey*, the holding was that the refusal of an officer to take a polygraph test was a valid ground for discharge and the court did not reach the question of admissibility. In *Austin*, all that was known was that a test had been administered. The results were also known, but they were not admitted into evidence and the Board there was admonished to ignore them in reaching its decision.

■■ We therefore conclude that the statutes which prohibit a court, but not an administrator or administrative agency, from requiring a polygraph test do not by innuendo allow its admission into evidence in the ensuing administrative proceeding.

This statement is not intended in any fashion to dilute the potency of the polygraph as an investigatory tool. As the *Coursey* court said:

"Effective and efficient operation of a police department requires that allegations of police misconduct be thoroughly investigated. The polygraph machine can be a useful investigative tool when the test is skillfully prepared and is administered and interpreted by a qualified person; while it is not accurate to the degree that absolute judgments can be made as to the veracity of the person tested [citation] the results are often reliable within recognized limits. Thus, for example, the results of a polygraph examination may be of help in narrowing the field of persons suspected of an offense or may assist in a determination whether to commence disciplinary action when, as here, there is an accusation against a police officer which he insists is untrue." 90 Ill. App. 2d 31, 43, 234 N.E.2d 339, 344-45.

In an era which worships technology at the expense of cerebration, the polygraph has attained a stature and an acceptance in the public mind far in advance of that achieved in the world of jurisprudence. *Coursey* and other related cases (*e.g., Buege v. Lee* (1978), 56 Ill. App. 3d 793, 372 N.E.2d 427) recognize its usefulness in dispelling doubts raised in the public arenas of mass communications towards the integrity of police

departments. However, wide public acceptance is no proof of reliability; examples abound: the steamship Titanic, the drug thalidomide, the Insull business empire.

■■ The reliability of the polygraph, together with the case law and its attendant legal literature, is exhaustively reviewed in *People v. Monigan* (1979), 72 Ill. App. 3d 87, 390 N.E.2d 562, so we find no necessity to reiterate it here. Suffice it to say, we agree with what is said there on the subject. The day may come when the reliability of the polygraph will be sufficiently established to allow its results to be admitted into evidence, but that must await another time and another court. For the nonce, it remains an investigative tool.

Defendants make the further argument that the polygraph results are admissible by reason of section 12(2) of the Administrative Review Act (Ill. Rev. Stat. 1979, ch. 110, par. 275(2)) providing in substance that the failure of an administrative agency to observe the technical rules of evidence shall not be grounds for reversal of its decision. No authority of which we are aware indicates that this statute abrogates all of the rules of evidence in an administrative proceeding. In a sense, all rules are technical, but we find the statement in *Novicki v. Department of Finance* (1940), 373 Ill. 342, 344, 26 N.E.2d 130, 131, particularly appropriate:

> "Counsel for appellant suggests, and we think rightly so, that this provision [section 8 of the Retailers' Occupation Tax act, similar in nature to the statute involved in the instant case] may permit the asking of leading questions and other informalities in the introduction of evidence, but that the legislature did not intend by section 8 to abrogate the fundamental rules of evidence."

We have already held the polygraph to be incompetent evidence. This is fundamental, not technical.

Furthermore, section 12(2) contains a proviso that the failure to observe the rules shall not be ground for reversal unless the failure "materially affected the rights of any party and resulted in substantial injustice to him." It is difficult to imagine a greater effect upon one's rights than the loss of one's job.

Defendants also make the argument that the Board possessed sufficient sophistication to ignore incompetent evidence in the manner of a trial judge sitting at bench. This appears totally inconsistent with the Board's order which recites almost total reliance upon the polygraph evidence.

■■ Having decided that the admission of the polygraph results tainted the entire proceeding, we must next determine what is to be done with this case. Defendants argue here, and apparently also argued to the trial court, that there is sufficient evidence *aliunde* the polygraph results to support the order of the Board. The trial court found, and we agree, that

this approach was not taken by the Board at the hearing stage. Both orders rely almost entirely on the polygraph. It therefore is appropriate that a new hearing be had without the polygraph evidence. This becomes doubly important, since it will also become the initial responsibility of the Board to fix any penalty. Here the statement of the supreme court in *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (1981), 85 Ill. 2d 547, 552, 426 N.E.2d 885, 887, is significant:

> "We agree with the appellate court decisions finding that the question of whether cause for discharge exists should be determined by the administrative agency. We therefore hold that the agency's decision as to cause will not be reversed unless it is arbitrary, unreasonable or unrelated to the requirements of service. [Citation.]"

In the instant case it cannot be determined on the existing record and orders whether (1) the findings are against the manifest weight of the evidence and (2) whether any decision as to cause is arbitrary, unreasonable and unrelated to the requirements of service.

The order of the circuit court that polygraph detection deception tests may not be admitted into evidence over objection in administrative proceedings is affirmed. The cause is remanded to the circuit court of McLean County with directions to remand it further to the Board of Fire and Police Commissioners of Bloomington for a new hearing without polygraph evidence from which the Board may make new findings of fact and assess any penalty appropriate thereto, and for further proceedings in accordance with the views expressed herein. *Reinhardt v. Board of Education* (1975), 61 Ill. 2d 101, 329 N.E.2d 218.

Affirmed in part and remanded with directions.

TRAPP, P. J., and LONDRIGAN, J., concur.