EMANUEL MANIAS, Plaintiff-Appellee and Cross-Appellant, *v.* PEORIA COUNTY SHERIFF'S DEPARTMENT MERIT COMMISSION, Defendant-Appellant and Cross-Appellee.

Third District   Nos. 81—632, 81—647 cons.

Opinion filed October 12, 1982.

BARRY, P. J., dissenting in part and concurring in part.

John A. Barra and Chris L. Fredericksen, both of Peoria, for appellant.

Thomas F. McGuire, of Long Grove, for appellee.

JUSTICE HEIPLE delivered the opinion of the court:

Following a hearing before the Peoria County Sheriff's Merit Commission, Lieutenant Emanuel Manias was found guilty of violating rules of the Sheriff's Office Duty Manual. As punishment, the commission ordered him reduced in rank from lieutenant to deputy sheriff. The complaint against Manias was in two counts.

The first charge alleged that Manias engaged in conduct unbecoming an officer which would tend to bring discredit to the sheriff's department and that on December 6, 1980, Manias engaged in acts which resulted in the abuse of Peoria County property. The underlying factual basis for that charge was that Manias drove a squad car after being warned that the car had a broken fan belt whereupon the car caught fire and was destroyed.

The second charge alleged that Manias filed a false report pertaining to the above incident. Specifically, that he lied when he denied in his report that the red alternator light on the car's dashboard was flashing when he drove it.

On appeal to the Peoria County Circuit Court, the finding on the first charge was affirmed, the finding on the second charge was reversed, and the cause was remanded to the commission for reconsideration of the penalty. Cross-appeals were filed.

As to the first charge, there is no question but that the car caught fire after Manias drove it. There is no evidence, however, that Manias drove the car to damage it or that he could have reasonably expected that such damage would occur. Moreover, there is no evidence in the record to indicate what caused the fire. To conclude that the fire started because of the broken fan belt is to indulge in sheer conjecture. For Manias to be guilty as charged, it must be proven that he intentionally or recklessly caused damage to the car. To prove that the car had a broken fan belt; to prove that Manias knew of the broken

fan belt; to prove that Manias drove the car with this knowledge; and to prove that the car thereupon caught fire, all taken together, do not prove that Manias violated any rule of the Sheriff's Office Duty Manual or that, indeed, Manias did anything wrong. What would have to be shown is that the broken fan belt caused the fire and that Manias knew or should have known that a fire would be caused if he drove a car with a broken fan belt. Such proof was lacking.

The record discloses that before Manias came into possession of the subject car, the car was in the possession of Sergeant Bland who drove the car during his shift. Toward the end of his shift, Bland noticed the red alternator light appear on the dashboard. The car commenced to handle as if it had manual steering when, in fact, it was equipped with power steering. Bland drove the car back to the jail where he investigated under the hood. There he observed a broken fan belt. Bland removed the fan belt and placed it on the radiator. Nothing else appeared unusual about the car or its engine to Bland. He then reported the broken fan belt to Manias. In response to Manias' question if the car could be driven to the garage to be replaced, Bland's only expressed concern was whether the car would have sufficient electrical power to be driven. Bland's warning went no further. Bland did not tell him about the red alternator light. He did not tell him that he had removed the fan belt and placed it on the radiator. There was no warning about the possibility of fire. While the record shows that Bland told Manias not to drive the car (only because of the broken fan belt), the record also reveals that Bland told Manias he could drive the car if he kept the alternator/battery going.

Manias' purpose in driving the car was to deliver the disabled car to a different post. He knew that no mechanic was on duty at the time (1 a.m.) and he wanted to pick up another squad car for his use during the approximately three-hour balance of his shift.

To minimize the drain of amperage during the six-mile trip, Manias used his parking lights, rather than headlamps, as needed. Although he noticed that the power steering was not operating, he stated that the car was not any more difficult to steer than a manual vehicle without power steering. He also stated that he did not observe the red alternator light flash on at any time during the drive.

Upon arriving at his destination, Manias parked the car and proceeded into the building. He placed the keys in a box, observed that three other cars were available, picked up a key to one of those cars and sat down to chat with the officers on duty. Within a few minutes, another officer said he heard a popping noise and went to the door to check it out. He yelled back that the car was on fire. The vehicle was

burned beyond repair at a cost of $7,142 and could be used thereafter only for its parts.

That a fire occurred after Manias drove the car is undisputed. But nowhere in the record is the cause of the fire established. *Post hoc ergo propter hoc* or "after this, hence because of this," is one of the classic logical fallicies. That is to say, it is not sufficient to conclude that a prior event caused the second event merely because event two followed event one in sequence. A myriad of causes can result in a car catching fire. In truth, no one knows what caused the car to catch fire on the night Lieutenant Manias drove it. Perhaps it was the broken fan belt. Perhaps it was something else. Moreover, nowhere in the record is there evidence that fire is a foreseeable consequence of driving a car six miles with a broken fan belt. Thus, it is unreasonable to find Manias guilty of misconduct and abuse of property in light of the evidence presented. Presumably, the car might have caught fire even if Lieutenant Manias had not driven it at all. In such case, Sergeant Bland would have been the last person to drive the car. There is no rule that holds a person accountable merely because a car catches fire after he uses it.

The second count charged that Manias lied about the fire. Specifically, count II alleged that Manias filed a false report about the fire in that he denied seeing the red alternator light when he drove the vehicle immediately preceding the fire.

Several days after the fire, Chief Deputy Gail Owens took a statement about the incident from Manias. This statement was transcribed into a written document and signed by Manias. Therein, Manias asserted that he did not see any red warning lights appear when he drove the car. In fact, he experienced no trouble with the car when he drove it, except for the steering which was a little stiff but certainly maneuverable. He claimed it was no different from his own car, which has manual steering. A month and one-half later, the sheriff ordered Manias to submit to a polygraph examination about the fire.

Pursuant to the two count charge against Manias, several days of hearings were held before the Peoria County Sheriff's Department Merit Commission. Manias told the commission the same story: he saw no warning lights and had no reason to believe the car was in immediate danger of fire destruction or any type of destruction. The polygraph examiner testified that Manias lied when he said that he did not see the red alternator light.

As a matter of law, polygraph results are not reliable and are inadmissible in administrative hearings.

In *People v. Baynes* (1981), 88 Ill. 2d 225, 244, 430 N.E.2d 1070,

1079, the Illinois Supreme Court determined that admission of polygraph evidence in a criminal trial is plain error because such evidence is not reliable enough to be admitted for the purpose of determining a person's guilt or innocence. Similarly, in *Sommer v. Goetze* (1981), 102 Ill. App. 3d 117, 121, 429 N.E.2d 901, 904, an appeal from a finding of guilt entered by the Tazewell County Sheriff's Merit Commission, which was affirmed in the trial court, we stated:

> "Although the rules of evidence are more casual in an administrative adjudication (*Northwestern University v. City of Evanston* (1977), 55 Ill. App. 3d 609, 370 N.E.2d 1073, *rev'd on other grounds* (1978), 74 Ill. 2d 80, 383 N.E.2d 964), such casualness cannot abrogate the right to a just, fair and impartial hearing. With the reliability of the polygraph examination so vulnerable to so many varying attacks, we believe justice, fairness and impartiality are abrogated when the results of such examinations are considered as substantive evidence."

(See also *McGowan v. City of Bloomington* (1981), 99 Ill. App. 3d 986.) Accordingly, we affirm the trial court's finding of error in the admission of polygraph test results at Manias' hearing before the commission.

Once the polygraph evidence is excised, the record is devoid of any evidence that Manias lied. All that was proved on this point was that the red alternator light flashed on the dashboard prior to Manias' possession of the vehicle. A service representative for the auto company testified that the warning light would appear "periodically" and light up the dash if it were operating. He acknowledged that it could malfunction. He specifically testified that the light would come on if the bulb was not burned out, if the battery had a charge and if the car had no electrical problems. A mechanic testified that a defect in the electrical system could cause an alternator light not to activate. This testimony notwithstanding, as it is not Manias' burden to prove he did not lie, the credible evidence in the record demonstrates that the sheriff did not prove that Manias knowingly filed a false report about the fire.

Accordingly, there being no credible evidence to support either of the two charges against Lieutenant Manias, the trial court should be affirmed in its dismissal of the charges as to false report and reversed as to its affirmance of the charges as to damaging property. Neither charge being supportable by the evidence, there is no occasion to remand this proceeding either to the trial court or the commission. Emanuel Manias is entitled to reinstatement to his rank of lieutenant without further proceedings.

Trial court affirmed in part and reversed in part. Plaintiff Emanuel Manias ordered reinstated.

Affirmed in part; reversed in part.

SCOTT, J., concurs.

PRESIDING JUSTICE BARRY, dissenting in part and concurring in part:

I choose, at the risk of some repetition, to recite the facts as I believe the record shows them to be, and to separately express my views on the issues as presented to us by the parties.

On December 5, 1980, Sergeant Earl Bland of the sheriff's department, while on duty and driving squad car No. 717, observed that the alternator light was flashing on the dashboard and the vehicle became difficult to steer. He proceeded approximately seven blocks to the jail, raised the hood, and discovered that the main fan belt was broken.

Since Bland's shift was over, he walked into the jail house and reported the squad car disablement to his relief, Lieutenant Manias. Manias was engaged in a telephone conversation when Bland approached him with news of the squad car problem, and the testimony of the two officers differed somewhat as to the information they exchanged concerning the car. According to Manias, he was discussing on the telephone the whereabouts of a woman he had previously arrested who had failed to return to the jail. The person he was talking with said that if he went to a certain tavern right away, he could pick her up. He said Bland came in and mentioned a problem with the power steering and said that the fan belt was broken. Manias then asked if the car could be driven to Post 3, the squad room about six miles away where the Department's repair shop was located. It was Manias' understanding that Bland answered to the effect that the car couldn't be driven all night because it would lose amperage and the battery would give out. Contrariwise, Bland's testimony concerning the matter was that he told Manias, as Manias was leaving the building to pick up the prisoner, not to take squad car No. 717. What was actually communicated is a question of fact, of course.

In any event, Manias encountered Detective Dave Owens on his way out of the jail house and arranged to take Owens' car, an unmarked squad car, to pursue the missing prisoner. Meanwhile, squad car No. 717 remained parked at the jail. Around 1 a.m. that night, after he had returned from an unsuccessful search for the female pris-

oner, Manias decided to deliver the disabled squad car to Post 3. Manias knew at the time that no mechanic would be on duty until later in the morning, but he wanted to pick up another squad car for his use during the approximately three-hour balance of his shift.

To minimize the drain of amperage during the six-mile trip, Manias used his parking lights, rather than headlamps, as needed. It was his recollection at the hearing before the commission that he had stopped only once for a stop sign and had driven about five miles per hour over the speed limit, averaging between 35 and 50 miles per hour during the drive. Although he noticed that the power steering was not operating, he stated that the car was not any more difficult to steer than a manual vehicle without power steering. He also stated that he did not observe the red alternator light flash on at any time during the drive to Post 3.

On arriving at his destination, Manias parked squad car No. 717 and proceeded into the building. He placed the keys to No. 717 in a box, observed that three cars were available, picked up a key to one of those and sat down to chat with the officers on duty. Within a few minutes, Officer Harry Tomkins, in charge of the squad room at the time, said he'd heard a popping noise and went to the door to check it out. He yelled back that No. 717 was on fire. The vehicle, a 1980 Ford LTD which had cost the department $7,142, burned beyond repair, and could only be used thereafter for its parts.

On December 10, 1980, Lieutenant Manias was interviewed by Chief Deputy Gail Owens concerning the fire. Manias thereafter gave a written statement which was ultimately admitted into evidence at the administrative hearing. On January 26, 1981, Manias was ordered by the sheriff to submit to a polygraph examination concerning the December 5-6 incident. The polygraph examiner testified at the hearing that it was his opinion that Manias had not been truthful when he stated that he had not noticed any mechanical problem with No. 717 other than the power steering, specifically when he denied having seen the alternator light flash on during the trip to Post 3, and when he stated that he had not intentionally lied in the statement given to Chief Owens.

On February 16, 1981, the sheriff of Peoria County filed a complaint with the commission charging violations of Rules 3.5(7), 3.5(4), and 3.5(6) of the Sheriff's Office Duty Manual of Rules and Regulations. Specifically, these rules permit the imposition of disciplinary action for: failure to report honestly and accurately all facts pertaining to an investigation or other matter of concern to the department; conduct unbecoming an officer, which would tend to bring discredit to

the department; and abuse of county property, respectively.

After receiving the testimony and other evidence, including demonstrations and exhibits, the commission, as fact-finder, entered its order finding that Lieutenant Manias was guilty of violating the rules as charged and imposing as punishment therefor a reduction in rank from lieutenant to deputy sheriff.

On May 6, 1981, Manias filed a complaint for administrative review contesting both the findings of guilt and the punishment imposed by the commission. After reviewing the record and considering arguments of counsel, the trial court entered its order, reversing the commission's finding of guilt as to count II (failure to report honestly and accurately) and affirming the finding of guilt as to count I (official misconduct and abuse of county property), and remanded the cause to the commission for reconsideration of the punishment to be imposed. This appeal and cross-appeal ensued.

The commission raises three primary issues on appeal: (1) Whether the trial court erred by permitting Manias to raise issues or defenses not presented to the administrative agency; (2) whether polygraph examinations are admissible in administrative proceedings; and (3) whether introduction of the polygraph examination results, if error, was nevertheless harmless under the circumstances of the case. Manias' cross-appeal raises additional issues: (1) Whether the commission's finding of guilt on count I was contrary to the manifest weight of the evidence; and (2) whether the commission improperly admitted as evidence Manias' oral and written statements to Chief Deputy Owens.

The commission grounds its initial argument on the fact that at the administrative hearing Manias' counsel objected to testimony concerning the results of the polygraph examination specifically on the basis that no written warnings were given and that the examination had not been transcribed pursuant to *Palcek v. City of Chicago Heights* (1979), 74 Ill. App. 3d 702, 393 N.E.2d 1218. On review however the trial court, in reversing the finding of guilty on count I, agreed with Manias and found as a matter of law that polygraph results are not reliable. *McGowen v. City of Bloomington* (1981), 99 Ill. App. 3d 986, 426 N.E.2d 328.

I find that Manias' counsel sufficiently preserved the issue of reliability of polygraph examination results at the administrative hearing so that his arguments on admissibility of such evidence were properly before the trial court on review. Dr. Brian Curtis, professor of physiology at the University of Illinois School of Medicine, Peoria, appeared before the commission as the first witness to testify on behalf

of Manias. His testimony related solely to the reliability of the polygraph as a scientific tool for determining truth or falsity of a subject's answers to questions. It was his opinion that the polygraph is not reliable for determining that a subject lied, although it is relatively accurate for determining that a subject told the truth.

In rebuttal, counsel for the sheriff produced Joseph P. Buckley III, director of John Reid & Associates of Chicago, who testified in favor of the reliability of polygraph examination results. In final arguments before the commission, counsel for both parties vigorously argued the issue of the polygraph's reliability. Mr. Serritella, counsel for Manias, specifically argued to the commission that polygraph results are inadmissible in both civil and criminal court proceedings because of their unreliability.

I believe that the record before the circuit court on review adequately raised the issue of the inadmissibility of polygraph results based on unreliability even though counsel's specific objection to the evidence during the presentation of the sheriff's case in chief was based on the *Palcek* case. The commission cannot claim surprise or that it was deprived of an opportunity to contest the issue of polygraph reliability at the administrative hearing. It is my opinion that principles of fundamental fairness should apply so as to permit Manias to present the polygraph reliability issue to the trial court on review. See 2 Am. Jur. 2d *Administrative Law* secs. 724-726 (1962).

The commission's second argument on appeal is that polygraph examination results are admissible for purposes of an administrative hearing such as was had in this case. I agree with the majority opinion in that polygraph examination results are inadmissible.

The commission's final argument is that even if Manias sufficiently preserved the reliability issue and the trial court was correct in finding that admission of the test results was error, such admission in this case was, nonetheless, harmless. Again, I concur with the majority's implicit holding that admission of polygraph results is not harmless.

The commission relies primarily upon testimony from Officer Bland in asserting that ample evidence independent of the polygraph testimony established that Manias lied when he stated he had not seen the red alternator light come on during his trip to Post 3. However, the evidence established that as a consequence of the broken fan belt, the battery would lose its charge. Whether this might have caused the alternator light to dim, or whether another electrical malfunction might have caused the light not to come on were possibilities presented to the commission to explain the discrepancy between what Officer Bland had observed when he dropped No. 717 off at the jail

and what Manias purportedly observed some three hours later when he drove the car to Post 3. I cannot say therefore that the evidence, without consideration of the polygraph testimony, overwhelmingly supports the commission's conclusion that Officer Manias lied. I would affirm the trial court's determination that the admission of the polygraph test is reversible error.

The trial court remanded the instant case to the commission solely for reconsideration of the penalty. However, because the evidence of record as to count II (failure to report honestly and accurately) is conflicting and witness credibility is at issue, unlike my colleagues, I do not believe that we are in a position to determine on the record before us that the evidence of guilt without polygraph results is insufficient to sustain the charges.

Manias contends that oral and written statements given by him to Chief Deputy Owens are inadmissible under the principles of *Palcek v. City of Chicago Heights*. I find no merit in the lieutenant's position. *Palcek* held that, with respect to the right to written warnings before giving a statement which could serve as a basis for disciplinary proceedings, a city-employed police officer was entitled to the same protection afforded other city-employed civil servants. The court applied the doctrine of *in pari materia* by reading sections 10—1—18 and 10—1—18.1 of the Municipal Code into section 10—2.1—17 (Ill. Rev. Stat. 1977, ch. 24, pars. 10—1—18, 10—1—18.1, 10—2.1—17). Subsequent decisions have raised doubts about the result reached in *Palcek* (*Lupo v. Board of Fire & Police Commissioners* (1979), 82 Ill. App. 3d 449, 402 N.E.2d 624), and the applicability of the *Palcek* reasoning to disciplinary actions advanced under other statutes and ordinances. *Resman v. Personnel Board* (1981), 96 Ill. App. 3d 919, 422 N.E.2d 120 (under home rule powers, city enacted an ordinance which superseded the conflicting State statute and made the doctrine of *in pari materia* unavailable for purpose of including within the city code the requirement of section 10—1—18 of the State code); accord, *Mandarino v. Village of Lombard* (1980), 92 Ill. App. 3d 78, 414 N.E.2d 508; *Gegenwarth v. Department of Law Enforcement* (1982), 103 Ill. App. 3d 568, 431 N.E.2d 1383 (statute applicable to State law enforcement officers (Ill. Rev. Stat. 1979, ch. 121) does not require reading in section 10—1—18 of Municipal Code to ensure equal protection for State-employed officers).

I would hold, as did the courts in *Resman, Mandarino* and *Gegenwarth*, that the doctrine of *in pari materia* is inapplicable in the present case because the statute governing the disciplinary proceeding herein (Ill. Rev. Stat. 1981, ch. 125, par. 164) is distinct from the Municipal Code. Neither the County Police Department Act (Ill. Rev.

Stat. 1979, ch. 125, par. 101 *et seq.*) nor the newly enacted Sheriff's Merit System Act (Ill. Rev. Stat. 1981, ch. 125, par. 151 *et seq.*) requires that *Miranda*-type warnings be given before an officer's statement may be taken for use in subsequent disciplinary proceedings. I find no constitutional infirmity in the admission of Manias' oral and written statements at the administrative action brought by the sheriff herein. Accordingly, I would remand this cause to the commission for a new hearing on count II and for reassessment of the penalty.

In addition, Manias argues that the commission's finding of guilt as to count I (conduct unbecoming an officer and abuse of property) is contrary to the manifest weight of the evidence and cannot be sustained upon review since any violation of department rules was not shown to be intentional. Manias' manifest weight argument is meritless. And I believe the majority, in adopting Manias' position, misinterprets the mental element implicit in the charges. The sheriff's evidence conclusively established that Manias drove squad car No. 717 knowing it to be disabled at the time. That he may not have contemplated the resulting damage thus caused to the county-owned vehicle does not make his act unintentional. Manias' reliance on our recent decision in *Hale v. Hellstrom* (1981), 101 Ill. App. 3d 1127, 428 N.E.2d 1197, is misplaced. In *Hale*, an officer was disciplined for intentionally allowing unauthorized personnel to enter a crime scene. We found there that the evidence failed to support a finding of intentional violation. Officer Hale was acting in an emergency-type situation and he failed to ascertain whether uniformed dispatchers at the scene were authorized to be there. Had they been so authorized, Hale's act would have been condoned.

By contrast, in the present case Manias admitted that he knew that squad car No. 717 was disabled. He intentionally did not use it to pursue the female prisoner because he knew that he might encounter problems with the car. Nonetheless, disregarding the vehicle's disablement, he later intentionally drove it without headlights and through stop signs over 6 miles to Post 3. The resulting fire damage, even if not contemplated by Manias, was the consequence of an intentional act for which he is accountable under these circumstances. Accordingly, on the facts before us, I find no want of evidence sufficient to sustain the mental element of intent implicit in the sheriff's charge in count I of the complaint.

In sum, I would affirm the finding of guilt on count I and remand this cause to the commission for a new hearing on count II with directions to exclude results of the polygraph examination and to reassess the penalty.